| CLERK'S NOTICE | DOCKET NUMBER<br>1181CV02897 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

**CASE NAME:**
Robert Snider et al vs. Warren I. Green et al

Michael A. Sullivan, Clerk of Court
Middlesex County

**TO:**
John N Lewis, Esq.
John N. Lewis & Associates
42 Spring Street
2nd Floor
Watertown, MA 02472-3444

**COURT NAME & ADDRESS**
Middlesex County Superior Court - Woburn
200 Trade Center
Woburn, MA 01801

You are hereby notified that on 08/30/2016 the following entry was made on the above referenced docket:

ORDER: FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF JUDGMENT (WHICH SEE PGS. 1-17) ORDER OF JUDGMENT: For the above-mentioned reasons, the court orders as follows: (1) until further court order, the property at 287 Langley Road, Unit 39, Newton, Massachusetts, is not to be sold or encumbered; (2) judgment shall enter in favor of plaintiff Kathleen P. Dwyer, Chapter 7 Trustee of Warren I. Green, against defendant Marsha S. Green on Count I of the Amended Complaint; (3) that title to certain real property known and numbered as 287 Langley Road, Unit 39, Newton, Massachusetts, and more particularly described in the Condominium Deed attached hereto as Exhibit A, is deemed to have been held by Warren I. Green and Marsha S. Green, as tenants by the entirety, at all times since April 17, 2006, including as of January 16, 2013, the date of Warren I. Green's Chapter 7 bankruptcy filing, notwithstanding the fact that the Condominium Deed attached as Exhibit A purports to convey said real property solely to defendant Marsha S. Green; and (4) within thirty (30) days, a certified copy of this Judgment shall be recorded at the Middlesex South Registry of Deeds. (Elizabeth M. Fahey, Justice) copies mailed 8/30/16

| DATE ISSUED | ASSOCIATE JUSTICE/ ASSISTANT CLERK | SESSION PHONE# |
|---|---|---|
| 08/30/2016 | Hon. Elizabeth M Fahey | |

Date/Time Printed: 08-30-2016 14:23:38

SCV016_X1\ 08/2014

*39*

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.
SUPERIOR COURT
CIVIL ACTION
NO. 1181CV02897

KATHLEEN P. DWYER, Chapter 7 Trustee
Plaintiff

vs.

MARSHA S. GREEN
Defendant

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF JUDGMENT

What is left of this Complaint is a single count seeking to impose a resulting trust on the beneficial interest of Warren Green ("Warren" or "Green"), a debtor in bankruptcy under Chapter 7 of the U.S. Bankruptcy Code in his condominium residence located at 287 Langley Road Unit 39 in Newton, Massachusetts (the "Condominium"), that was purchased solely in the name of his wife, defendant Marsha S. Green ("Marsha," and collectively with Warren, the "Greens"). This matter came before me for a jury-waived trial. Because the Condominium was purchased in Marsha's name only for the primary purpose of placing the Condominium beyond the reach of Warren's creditors, the plaintiff's request to impose a resulting trust is **ALLOWED**.

### FINDINGS OF FACT

I make the following findings of fact based on the credible evidence presented at trial, as well as facts one through twelve agreed to by the parties. Warren Green is an attorney admitted to the Massachusetts bar in 1980; he worked as an attorney from 1980 to 1995, and then went into investment banking. Relative to that work, he worked at Northstar Global Partners, LLC ("Northstar") for a period of years.

Over time, Green's relationship with his partners at Northstar soured and ended when he was terminated in October 2004. Thereafter, Green consulted and subsequently retained Attorney Robert Snider ("Attorney Snider") to represent him in a freeze-out action brought against the Northstar shareholders to recover compensation (the "freeze-out action"). In connection with this action, Green and Attorney Snider executed a retention agreement on September 15, 2005; Exhibit 42 is that retention agreement. Since Green had been out of a job for some time before he joined the Northstar startup, he looked to Attorney to Snider to represent him for a contingent fee in asserting claims against Northstar.[1]

On September 25, 2005, Northstar brought a preemptive action against Green, Exhibit 7, and on October 3, 2005, Green and Attorney Snider entered into an additional fee agreement, Exhibit 43, which provided that Attorney Snider would defend Green against Northstar's suit at a rate of $250 per hour and contained an arbitration provision. Attorney Snider had initially been retained on a contingent fee basis to bring a claim on behalf of Green in the freeze-out action; once he was sued by Northstar, Green retained Attorney Snider on an hourly basis to defend against Northstar's claim. When Northstar sued Green first, and because defending Green against Northstar's lawsuit was not contemplated under the original contingent fee agreement, Green and Attorney Snider executed an hourly fee agreement to cover this additional representation.

Once the Northstar matter settled in November of 2007 and Attorney Snider learned that the Greens had purchased a new home solely in Marsha's name, he sued in Superior Court to recover the fees Green owed him. The issue of Attorney Snider's legal fees is fixed and has been

---

[1] The retention agreement provided for Attorney Snider to receive one-third of the amount recovered by Green against Northstar and for any dispute over the fee to be submitted to the Fee Arbitration Board of the Massachusetts Bar Association (the "FAB").

2

affirmed on appeal.[2] Green owes Attorney Snider those fees. The settlement between Northstar and Green included a payment by Northstar of some of Attorney Snider's legal fees. However, because there were two retention agreements, Warren owed Attorney Snider additional fees, beyond the fees Northstar paid. Because both retention agreements required for any dispute over the fee be submitted to arbitration, the parties went before the FAB, on January 21, 2009. Attorney Snider was successful at arbitration. The arbitrator's award in favor of Attorney Snider was confirmed in the Superior Court (MacLeod-Mancuso, J.), appealed by Green and affirmed on appeal.[3] The attorney's fees award that Green owes to Attorney Snider is the law of this case.

Once Warren's debt to Attorney Snider was affirmed on appeal, an execution issued and Attorney Snider then brought in the Newton District Court a supplementary process case, which in large measure caused Warren to file for bankruptcy on January 16, 2013. On page thirty of his Bankruptcy Petition, Exhibit 1, Green lists Attorney Snider as a creditor holding an unsecured non-priority claim for $100,000.00.[4] To date, Warren has not satisfied his debt to Attorney Snider. I accept Attorney Snider's testimony that Green had told him several times that he would pay the attorney's fees he owed once he sold his house. Not only did Warren not tell him when he sold his house, Warren did not ever tell him that their new home, the Condominium, had been purchased in only Marsha's name.

When they intentionally put the Condominium in only Marsha's name, the Greens were both well aware that Warren had current creditor Attorney Snider,[5] and potential creditor

---

[2] *Snider* v. *Green*, 79 Mass. App. Ct. 1102 (2011)
[3] At all relevant times, including when they bought the condominium in only Marsha's name, Attorney Snider was owed money by Warren, which both Greens knew. I accept the affidavit of Attorney Snider, Exhibit 8, as truthful and the facts stated therein were known then to Warren.
[4] Attorney Snider filed a Proof of Claim in November 2013 in Green's Chapter 7 Bankruptcy case in the amount of $63,530.02 based on the judgment and execution he had obtained against Warren.
[5] In that attorney/client relationship between Attorney Snider and Green, Warren was a very active client. He routinely visited Snider's office. As a former practicing attorney, he routinely read over and approved all the pleadings that Attorney Snider filed. Green visited very frequently in Attorney Snider's office, so bills were not

3

Northstar. The primary reason they did so was to avoid those creditors; to a lesser extent, if they could avoid future creditors, they sought that too. Marsha understood that Warren's line of work exposed him to more risk of being sued.[6]

I do accept that Marsha wanted to keep as much of their assets as she could for her family. That desire is not unreasonable. Before purchasing the Condominium, she knew that Warren had a lawyer, Attorney Snider, to whom Warren owed fees, though she may not have known the amount of the owed fees. They both knew before purchasing the Condominium in April 2006 that Warren then had two creditors, Attorney Snider and potentially Northstar. It was their joint and primary intention, at Warren's suggestion, to try to preserve from Warren's current creditors their ownership interest in that Condominium which interest was substantial even though there was a mortgage. I accept that Marsha, at Warren's suggestion, used $480,000.00 of their $698,181.40 sale proceeds[7] and purchased the Condominium only in her name. They retained the balance of $227,875.00 from the sale in their joint bank account. Notwithstanding this large balance, Green never paid Attorney Snider the legal fees Green owed. At least from 2006 – 2010, money from that joint account was used to pay the mortgage, real estate taxes for the Condominium and the Condominium fees. Whenever additional money was

---

mailed to him; he was given the bills. Warren knew, at the time of the hearing on January 27, 2006 on his motion to compel, that the fees he incurred in defending would likely at some point be covered by the advanced indemnity agreement between him and his Northstar partners. He also knew that to the extent those fees were not covered and for all work done to prosecute his counterclaims, he, Green, would owe those attorney's fees to Attorney Snider. Warren knew at the time of that hearing on January 27, 2006 that Attorney Snider had already spent 189.2 hours defending Warren for a total fee then owed $47,300.00. Warren was well aware before suggesting to his wife to put the Condominium in Marsha's name that he was indebted to Attorney Snider for at least $47,300.00.

[6] The JAMS settlement of that Northstar case was reached on November 8, 2007, with Warren being paid $260,000.00, less the $86,666.00 attorney's fees that Northstar paid directly to Attorney Snider. On April 17, 2006 when Marsha bought the Condominium in only her name, both Marsha and Warren well knew that Warren could be liable to Northstar, and that Warren owed to Attorney Snider.

[7] Marsha could not initially get a mortgage in her name at the amount she requested because she had never earned more than $20,000.00 of income in a year. Due to her limited earnings, Marsha had initially not qualified for a mortgage in only her name. When she increased the amount of the down payment as Sovereign requested, Sovereign Bank gave her a mortgage of $420,000.00.

4

necessary to pay those mortgages, Warren made deposits into their joint account. Although Warren had not earned the amount of money that he or she would have liked, or that he had been earning in some prior years, he was throughout their marriage the main breadwinner in that family.

In their discussion concerning buying the Condominium, I reasonably infer that Warren shared with his wife that putting the Condominium in only her name would not preserve it from his current creditors; they agreed that their new home, the Condominium, would be in just Marsha's name, to preserve whatever they could of their primary asset, their home.[8]

When Green "consented" (his word) to Marsha using $480,000.00 of the sale proceeds[9] to purchase the Condominium, he knew this would not protect the Condominium from current creditors. I do not credit his testimony that he did not have any current creditors in April 2013. He had closed their joint bank account in March 2010 as he feared his creditor, Attorney Snider, would attach that account. Green truthfully signed under the pains and penalties of perjury on May 7, 2007, that he is "obligated to pay [Attorney Snider] substantially more [sums] to represent me in this matter [Northstar's lawsuit]." (Ex. 55, ¶ 14).

At all relevant times, including the time of purchase, Warren and his wife both understood that Warren would have the same interest in that Condominium that he had in their home which they had owned as tenants by the entirety. I accept Marsha's deposition testimony, not her trial testimony, that Sovereign Bank, in giving her a mortgage, considered Warren's

---

[8] I discredit any testimony by Warren that he did not know he had any creditors in April 2006 when the Condominium was purchased in Marsha's name. Marsha now claims she did not know of any creditors in April 2006. I do not credit that. She knew about the Northstar suit. She did not know the particulars, she's not a lawyer, but she knew that Warren was being sued by Northstar. She knew that before April 2006 when they bought the Condominium in her name. She also knew prior to April 2006 that Attorney Snider was representing Warren in that lawsuit. She knew that lawyers generally do not work for free but charge fees.

[9] I do not credit Warren's testimony that he made a "gift" to her of his portion of that $480,000.00. I credit that there was never any discussion or writing concerning any gift.

5

income. I accept her testimony that Warren has "lived at the Condominium the same as at their prior home, not restricted," i.e. he had ownership and beneficial interests. When Marsha fell behind in her fist mortgage in 2013 – 2014, she renegotiated with Santander[10]; I credit her deposition testimony that Warren had to also sign the bank's refinance paperwork to extend her loan with a lower interest rate. At all times they lived in the Condominium, they both wanted to preserve as much as they could of their assets from at least Warren's current creditors, Attorney Snider and potentially Northstar.

For approximately twenty years, the Greens had owned a single family house at 29 Mayflower Road in Newton, Massachusetts (the "Mayflower Home"), as tenants by the entirety. On or about January 11, 2006, they sold their Mayflower Home to Boston College for $1,057,875.00. (Ex. 3). They then rented from Boston College until April 2006 when they bought the Condominium, by mutual agreement, in only Marsha's name. Since their purchase, both Greens have continuously resided in that Condominium. Before they bought the Condominium, Northstar had already sued Warren.[11]

Once the Greens found the Condominium where they wanted to live, they had a discussion. They were both concerned about the lawsuit that had been filed against Warren by Northstar. They both knew that Attorney Snider was representing him in defending that lawsuit and in his counterclaim. At Warren's suggestion, they made a joint decision for the Condominium to be purchased using $480,000.00 of the proceeds that they received from the sale of the Mayflower Home three months earlier, and for the Condominium to be put in only

---

[10] The mortgage is now with Santander which bought Sovereign.
[11] So $30,000.00 is the only amount of the attorney's fees that Attorney Snider ever received from Green. According to Ex.10, the four pages which detail how Green spent three large amounts of money, the $227,875.00 proceeds from the sale of their house, the proceeds of $169,000.00 from the Northstar settlement and the $250,062.00 of income he received in 2010, Green has never paid Attorney Snider all that he is owed, even though Green has paid other unsecured creditors.

Marsha's name as a way of preserving their assets from Warren's current and potential creditors.

I accept the testimony of the trustee in bankruptcy, Kathleen Dwyer. She was appointed the Chapter 7 Bankruptcy Trustee on Warren Green's Bankruptcy Petition. As trustee, her principal duty is to identify, collect and liquidate the debtor's assets. I accept her determination that Warren Green had, as of the time of his bankruptcy filing on November 27, 2013, at least $25,722.00 in assets, apart from the condominium where he lives with his wife, and he had liabilities of over $200,000.00 excluding taxes.

On October 2, 2008, both Greens became co-obligors for a $50,000.00 home equity line of credit from Sovereign Bank, which was secured by a second mortgage on the condominium. This home equity line has been used to pay some of their household expenses. I do not credit the testimony of Marsha or Warren otherwise.

It is important to my determination that in the Bankruptcy Petition in Schedule I, Exhibit 1, Warren lists his monthly income of $5,000.00, and his wife's monthly income of $2,000.00. On that bankruptcy financial statement, Green listed the following items as his/their expenses: rent/mortgage: $3,060.00 per month, utilities: $75.00 per week, home equity line: $165.00 per month. These amounts constituted the entire monthly payment for the mortgage and home equity line of credit. He claims under the pains and penalties of perjury average monthly expenses of $8,218.00 with a joint monthly income of $7,000.00. However, just a few weeks earlier, on October 31, 2012, Green prepared a sworn financial statement in connection with supplementary proceedings brought against him by Attorney Snider in the Newton District Court to collect his judgment. In this earlier statement, Green stated that his gross weekly income before social security and taxes was only $252.00. This is a substantially smaller amount that he swore under oath in his Bankruptcy Petition. The joint monthly income in Green's bankruptcy

7

schedule was approximately $4,400.00 greater than what he had reported to the Newton District Court in connection with the Supplementary Process action. (Ex. 1, at 38). Green explained that the reason he listed $5,000.00 in income is his Bankruptcy Petition and only $252.00 some weeks earlier, was because he had started working for a new client. I do not credit his testimony as he could not recall even the identity of the client or the amount of any retainer.[12]

Green made numerous payments of the mortgage for the Condominium and its fee, which are evidence of his and Marsha's intent that they, in fact, both owned the Condominium. From 2007 through 2010, Warren signed the checks from the Green's joint account paying the mortgage to Sovereign Bank on January 15, 2007, April 17, 2007, August 6, 2007, November 18, 2008, October 14, 2009, December 16, 2009, January 15, 2010 and April 10, 2010. This is clear evidence that at all relevant times he and Marsha considered him to be an owner of the Condominium in only her name with Warren having a beneficial and ownership interest in that Condominium. If he did not have such interests, there would be no reason for him to sign those mortgage checks, especially where Marsha was allegedly trying to establish her financial independence, which I do not credit. Green's mortgage payments from 2007 through 2010 further support this court's conclusion that they put the Condominium in only her name in 2006 mainly to prevent his current creditors from reaching it. Similarly, Green's listing in his Bankruptcy Petition of the mortgage and condominium fees for that Condominium as one of his and his family's liabilities/expenditures is evidence of his and Marsha's intent that they, in fact, both owned the Condominium but in only her name to prevent Warren's current creditors from reaching it but not to prevent Warren from having ownership or beneficial interests in that Condominium. These payments and filings by Warren are evidence of at least their intent and

---

[12] Most of Green's clients sign an engagement agreement usually paying a retainer and describing an accomplishment fee. If Green had this "new client," such information would be available to him.

8

behaviors that, for all practical purposes, he owned the Condominium with his wife in the same way that they had owned their house as tenants by the entirety.

From 2006 to the present, Green has been the sole proprietor of True North Advisors Group, LLC ("TNAG"). Green has always given the Commonwealth's Secretary of State's Office, as well as the Bankruptcy Court, the Condominium address, 287 Langley Road Unit 39 in Newton Center, Massachusetts, as the business address of TNAG. I accept that the Condominium is, in fact, the business address of that business. Green has had no other work space except for when one or two business associates have, from time-to-time, let him work in their space. I am not saying that he has employees or independent contractors working out of their Condominium or even that he sees clients there, but the Condominium is the business address and business location of TNAG.

Green also claimed a huge amount of money for utility bills for the Condominium, which he can legally claim only when the Condominium utilities are used for business purposes. To a great extent, the Condominium is where TNAG and Green do their business. Claiming $25,000.00 in utility bills for his primary business over five or six years is a substantially exaggerated amount but even so, it reflects that a large amount of Green's business is done inside that Condominium.[13]

When they owned their Mayflower Home for twenty years, the Greens had a certain way of doing their finances. They each had a business account at a bank and they also had a joint account; that joint account remained in place until approximately March 2010, almost four years after they had, by agreement, purchased the condominium in Marsha's name only. Since they moved into the Condominium, Warren has lived in it in the same fashion as he lived in the

---

[13] Marsha generally has not claimed any utility bills in relation to her part-time work at their Condominium.

9

Mayflower Home. At all relevant times, they paid the monthly mortgage for the Condominium, the Condominium fee, and the household expenses for the Condominium in the same way as they paid those items for their Mayflower Home. Most, if not all, of the money for their residence, both first home and then Condominium, came from Warren which was deposited in their joint bank account. Marsha works as a piano teacher and a food editor and does not earn more than $20,000.00 in any given year.[14] Her $20,000.00 or less annual earnings is not financing their $900,000.00 Condominium which is what they bought in her name in 2006. Since their purchase of the Condominium, Warren has exercised the degree of interest and control over the Condominium that is consistent with that of an owner, the same he exercised over their previous home.

From prior to 2006 until March 2010, Marsha and Warren still had a joint bank account.[15] Exhibits 23 to 29 are their joint bank statements, which account they used when they owned their Mayflower Home, and from which they paid their mortgage, the real estate taxes for their house, and which joint account they continued to use when they bought the Condominium to pay its mortgage, real estate taxes, Condominium fees, and to pay the home equity loan once it was opened in Marsha's name with Warren as the cosigner. It was Warren's income that, like at the Mayflower Home, paid most, if not all, of the expenses relative to the Condominium, not just some of those expenses as he testified. From 2007 to 2012, Warren earned $561,275.00, plus $169,000.00 from the Northstar settlement for total earnings over those six years of $674,420.00. Marsha earned $124,728.00 during that six year period.[16]

---

[14] In 2008, Marsha earned $15,635.00, well below the $53,000.00 of the Northstar settlement proceeds which Warren used to pay their household expenses that year for mortgage payments, real estate taxes, Condominium fees, homeowners' insurance, maintenance and repairs.

[15] Warren admits that he closed that account in March 2013 due to his concerns about Attorney Snider's collection action for his unpaid fees.

[16] From 2007 to 2012, the Greens filed joint tax returns including the deductions for interest paid on the mortgage and for the real estate taxes assessed on the Condominium.

10

When Marsha and Warren discussed buying the Condominium solely in Marsha's name, it was in substantial part due to their joint desire to protect and preserve their joint assets from paying attorney's fees to Attorney Snider, or paying any money to Northstar. I do not accept that either of them understood or accepted that Warren ever relinquished his ownership and beneficial interests in their largest financial asset, the Condominium.

In addition to this primary goal of protecting and preserving their assets as of April 16, 2006 from Northstar and/or Attorney Snider, I credit that Marsha and Warren were also interested in preserving generally their assets from being reached by creditors. They were especially concerned as Warren had some history of employment in jobs that did not pay much or on a regular basis, and because substantial claims had been filed against him in the recent case by Northstar.

So this discussion between Marsha and Warren concerned not only how to purchase the Condominium, but also how to protect and preserve it from Warren's creditors as much as possible. Based on these concerns, they agreed that Marsha should buy the Condominium in her name only. There was never any talk or writing about gifting her the sale proceeds from their Mayflower Home, or gifting her the Condominium. Nor was there any talk of divorce or separation; their marital relationship stayed the same as it had been when they had owned their Mayflower Home. Everything related to the Condominium, including payments relative to the Condominium, stayed the same as when they owned their Mayflower Home; nothing changed. There was no gift by Warren, just her name as the sole buyer on the deed in an effort to keep the Condominium from being accessed by Warren's current creditor, Attorney Snider and potential creditor, Northstar.

## RULINGS OF LAW

A resulting trust is an intent enforcing trust; it is "a reversionary, equitable interest implied by law" and the presumed intent of the parties in certain situations where one party holds property, in whole or in part, in trust for the benefit of another. *Eaton* v. *Federal Nat'l. Mort. Assn.*, 462 Mass. 569, 577 n.10 (2012) (internal citation omitted). See *Citizens Bank of Mass.* v. *Coleman*, 83 Mass. App. Ct. 609, 612 (2013) (noting that "[a] resulting trust pivots on the key element of intent."); *Cavadi* v. *DeYeso*, 458 Mass. 615, 624 (2011). The case for a resulting trust is established "by showing circumstances which raise a presumption that the person making the transfer or causing it to be made did not intend to give the transferee the beneficial interest in question, and thus that the interest remained in the transferor or payor or his or her estate." *Coleman*, 83 Mass. App. Ct. 612, quoting from Restatement (Third) of Trusts § 7 (2003).

Generally, the presumption of a resulting trust arises in situations where one party pays for property, in whole or in part, that for a different reason is titled in the name of another. See *Frank* v. *Frank*, 335 Mass. 130, 135 (1956). Such a trust, typically referred to as "a purchase money resulting trust," Restatement (Third) of Trusts § 7 cmt. c, is "based upon the 'natural presumption that, in the absence of anything to show the contrary, he who supplies the purchase price intends that the property bought shall inure to his own benefit and not that of another, and that the conveyance is taken in the name of another for some incidental reason.'" *Coleman*, 83 Mass. App. Ct. at 613, quoting *Quinn* v. *Quinn*, 260 Mass. 494, 501 (1927). Resulting trusts are not limited, however, to circumstances where the purchase price is paid by another. Rather, resulting trusts are properly recognized in equity "under a variety of circumstances" where the circumstances surrounding the disposition of property raise an inference that the transferor does

not intend that the person taking or holding the property should have the beneficial interest therein. *Coleman*, 83 Mass. App. Ct. at 613.

Where there is a gratuitous transfer between family members, including spouses, there is no initial presumption of a resulting trust. *Robinson* v. *Robinson*, 366 Mass. 582, 585 (1974) ("[W]here the husband makes a payment to procure a conveyance to his wife, there is a presumption that he intends a gift to her. . . ."); *Frank*, 335 Mass. at 135 (same). In such cases, there is a contrary presumption of a gift. *Coleman*, 83 Mass. App. Ct. at 613–614. That presumption is not absolute, however, and may be overcome and a resulting trust established if "(1) the intent of the transferor at the time of the transfer was not to convey the beneficial interest to the transferee, and (2) there was acquiescence on the part of the transferee." *Id.* at 617-618.

It is not required that an agreement existed between the parties at the time of conveyance, "nor is it necessary to establish that the transferee promised to reconvey the property to the transferor." *Id.* at 617. Instead, the parties' intent is "the key element." *Id.* at 612. See also *Cavadi*, 458 Mass. at 625 ("[A] resulting trust merely requires proof of intent that the person holding title not also hold the beneficial interest."). Although "a resulting trust must arise, if at all, at the time of the execution of the deed," *Maffei* v. *Roman Catholic Archbishop of* Boston, 449 Mass. 235, 254 (2007), in determining whether the requisite intent exists it is necessary to review the circumstances as a whole along with the manner in which a transaction is subsequently treated by the parties. *Coleman*, 83 Mass. at 617 (intent evinced "from the entire course of the couple's conduct"); *Kennedy* v. *Innis*, 339 Mass. 195, 202 (1959) ("[T]he manner in which the transaction was subsequently treated [] is significant of their understanding of its nature."); *Lambrou* v. *Lambrou*, 87 Mass. App. Ct. 1105, 2015 WL 668456 at *6 (2015)(Rule 1:28 Unpublished Decision)(transferors continued "exercise . . .[of] indicia of ownership" was

13

basis of resulting trust); *Krasner* v. *Krasner*, 362 Mass. 186, 189 (1972).

I find and hold that the plaintiff has rebutted the presumption of donative intent and that at all relevant time, including the time of purchase, Warren and Marsha's true and actual intent was that Warren would retain the same beneficial interest in the Condominium that he had in their Mayflower Home which they had owned as tenants by the entirety. As a result, equitable ownership of the Condominium was in both Warren and Marsha from the time of purchase even though Marsha held title to the Condominium in her name only.

There was no credible evidence presented tending to show that Warren made a "gift" of his unquantified share of the Mayflower Home sale proceeds to Marsha; there was never any discussion or writing to that extent. To the contrary, considering the entire course of the Greens' conduct against the backdrop of financial maneuvering, the presumption of a gift has been rebutted and the requisite intent established to support a resulting trust because of: the Greens' longstanding practice of having the costs associated with their marital dwelling paid for from a joint account primarily funded by Warren's income; their agreement, at Warren's suggestion, to have Marsha purchase the Condominium in only her name for the primary purpose of shielding that asset from Warren's current creditor Attorney Snider and potential creditor Northstar; the considerable number of mortgage payments over the years paid and written by Warren; and Warren's statements asserting ownership in his Chapter 7 Bankruptcy Petition.

As discussed in detail below, it is clear that at the time of and after the sale, Warren intended and expected, with Marsha's knowledge and assent, to retain beneficial interest in the Condominium, notwithstanding their agreement to purchase the Condominium in only Marsha's name. The decision that Marsha purchase the Condominium in her name only was to keep and

14

preserve their main asset, the Condominium, from the reach of creditors, not to change in any way their joint ownership and beneficial interest in their marital residence.

Although Marsha is the record title holder, mortgagor and maker of the initial note securing the Condominium, Sovereign Bank considered Warren's income in granting Marsha the mortgage. On October 2, 2008, both Warren and Marsha became co-obligors for a $50,000.00 home equity line of credit from Sovereign Bank, which was secured by a second mortgage. This home equity line of credit was then used to pay expenses associated with the Condominium. Thereafter, when Marsha fell behind on her mortgage payments and renegotiated with Santander in 2013-2014, Warren also signed the refinance paperwork to secure a loan with a lower interest rate. The income disparity between Marsha and Warren, not only at the time of the purchase, but at all relevant times thereafter, and Warren's subsequent contractual undertaking of mortgage and loan obligations associated with the Condominium, evinces his and Marsha's intent that they, in fact, both owned the Condominium. See *Coleman*, 83 Mass. App. Ct. at 618 (stating that purporting to grant a mortgage in a property is "consistent with beneficial ownership"); *Murphy v. McKenzie*, 1 Mass. App. Ct. 553, 555-556 (1973) (where the defendant took title to property but consideration was paid in part by the plaintiff and in part from the proceeds of a mortgage given by the defendant to a bank, and the plaintiff subsequently assumed responsibility for, and made mortgage and tax payments, trust resulted in favor of the plaintiff). Cf. *Krasner*, 362 Mass. at 189 (resulting trust imposed where husband paid all expenses associated with property and exercised control over it).

In addition to Warren and Marsha's joint contractual obligations on the home equity line of credit, Warren and Marsha lived in the Condominium in the same fashion that they had lived in their Mayflower Home. While the mere act of residing in the home does not, standing alone,

15

establish the requisite intent to retain a beneficial, see *Krasner*, 362 Mass. at 189, it is a factor consistent with ownership. Similar to their post-purchase living arrangements, Warren and Marsha continued their longstanding practice of paying all of the expenses associated with their marital dwelling from a joint account primarily funded from Warren's earnings. Thus, Warren's financial responsibilities were nearly identical to those he held when the couple lived in the Mayflower Home. Not only did the mortgage and home equity loan payments come from Warren's earnings, but most if not all of the expenses associated with the Condominium, including property taxes, the Condominium association fees, and utilities were paid from Warren's income. These payments by Warren are evidence, at the very least, of Warren and Marsha's intent to divide beneficial ownership in the Condominium in the same fashion as they had in their Mayflower Home. Cf. *Krasner*, 362 Mass. at 189 (resulting trust imposed where, in addition to other factors indicating intent to retain beneficial interest, husband paid all expenses connected with property).

Of significant importance to my conclusion that Warren's actual intent, and Marsha's assent thereto, was to retain a beneficial interest in the Condominium are the following items listed in Warren's Chapter 7 Bankruptcy Petition: that Warren is the cosigner of a home equity loan on the Condominium, that the Condominium is TNAG's business address, and Warren's significant monetary contributions to expenses associated with the Condominium (i.e., the mortgage, utility fees, taxes and association fees). *In re Warren*, Ch. 7 Case No., 13-BK-10204 (Bankr. D. Mass. Jan 16, 2013). These statements of ownership, made under the pains and penalties of perjury, demonstrate that Warren intended, with Marsha's tacit consent, to retain a beneficial interest in the Condominium while insulating it from the reach of creditors. See

16

*Coleman*, 83 Mass. App. Ct. at 618–619 (husband's undisputed statements asserting ownership over rental properties considered in determining intent to retain beneficial interest).

Based on these facts, and in conformity with Warren's intent and expectation, with Marsha's knowledge and assent thereto, I hold that beneficial interest in the Condominium, notwithstanding their agreement to purchase the Condominium in only Marsha's name, is vested in both Warren and Marsha, holding the Condominium as tenants in the entirety. As a result, the plaintiff may, in accordance with the applicable statutory exemptions, reach the Condominium to satisfy Warren's debts. See *Innis*, 67 Mass. App. Ct. at 391 ("That real property is owned by the entirety does not mean that the interest of a debtor spouse has no value to his or her creditors.").

## ORDER OF JUDGMENT

For the above-mentioned reasons, the court orders as follows: (1) until further court order, the property at 287 Langley Road Unit 39, Newton, Massachusetts, is not to be sold or encumbered; (2) judgment shall enter in favor of plaintiff Kathleen P. Dwyer, Chapter 7 Trustee of Warren I. Green, against defendant Marsha S. Green on Count I of the Amended Complaint; (3) that title to certain real property known and numbered as 287 Langley Road Unit 39, Newton, Massachusetts, and more particularly described in the Condominium Deed attached hereto as Exhibit A, is deemed to have been held by Warren I. Green and Marsha S. Green, as tenants by the entirety, at all times since April 17, 2006, including as of January 16, 2013, the date of Warren I. Green's Chapter 7 bankruptcy filing, notwithstanding the fact that the Condominium Deed attached as Exhibit A purports to convey said real property solely to defendant Marsha S. Green; and (4) within thirty (30) days, a certified copy of this Judgment shall be recorded at the Middlesex South Registry of Deeds.

_____
Elizabeth M. Fahey
Justice of the Superior Court

Dated: August 30, 2016